UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL DUNN,<br><br>      Petitioner,<br><br>   v.<br><br>MONTGOMERY,<br><br>      Respondent. | Case No. 2:21-cv-2103-CJC (MAR)<br><br><br>FINAL REPORT AND<br>RECOMMENDATION OF UNITED<br>STATES MAGISTRATE JUDGE |

This Final[1] Report and Recommendation is submitted to the Honorable Cormac J. Carney, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

## I.

## SUMMARY OF RECOMMENDATION

Petitioner Michael Dunn ("Petitioner") has filed a pro se Petition for Writ of Habeas Corpus by a Person in State Custody ("Petition") pursuant to 28 U.S.C. § 2254 ("section 2254"), challenging his 2015 state conviction for second-degree

---

[1] The Court issues this Final Report and Recommendation to address Respondent's Objections. See Dkt. 17.

1    murder.  ECF Docket No. ("Dkt.") 1.  Petitioner asserts multiple claims of

2    instructional error and challenges the exclusion of evidence.

3            Because Petitioner's claims fail on their merits, the Court recommends

4    **DENYING** the Petition.

5                                                    **II.**

6                                **PROCEDURAL HISTORY**

7    **A.      STATE COURT PROCEEDINGS**

8            On March 23, 2015, following a jury trial with co-defendant Julius Harris in the

9    Los Angeles County Superior Court, Petitioner was convicted of second-degree

10   murder (Cal. Pen. Code § 187(a)).  CT[2] at 29, 75–76; RT[3] at 4807–08.[4]  The jury also

11   found true that Petitioner both personally used a firearm, and personally and

12   intentionally discharged a firearm, but found not true that he personally and

13   intentionally discharged a firearm causing great bodily injury (Cal. Pen. Code

14   § 12022.53(b), (c), (d) & (e)(1)).  CT at 29, 75–76; RT at 4808–09, 5704.  Finally, the

15   jury found true the allegation that the crime was committed for the benefit of, at the

16   direction of, or in association with a criminal street gang (Cal. Pen. Code §

17   186.22(b))[5].  CT at 29, 76; RT at 4809.

18   _____

19   [2] The Court takes judicial notice of the documents lodged by Respondent in other cases that are
     relevant here.  See Fed. R. Evid. 201(b)(2); United States v. Raygoza-Garcia, 902 F.3d 994, 999 n.2,

20   1001 (9th Cir. 2018) (a court may take judicial notice of undisputed matters of public record, which
     may include court records and dockets available online).  The Clerk's Transcript cited here, from

21   Petitioner's second appeal, was lodged in conjunction with Respondent's motion to dismiss
     Petitioner's prior federal habeas petition.  See Dunn v. Montgomery, No. 2:19-cv-08059-CJC (JEM),

22   Dkt. 8–1.  Respondent identified the documents in that lodgment as follows:

23          A. Clerk's Transcript, One Volume (excluding confidential probation report at pages 9 through
             25), Lodg. A ("CT")

24          B. Docket for California Court of Appeal case number 300289 ("Lodg. B")
     [3] The Reporter's Transcript was lodged in conjunction with Respondent's Answer filed in Harris's

25   federal habeas proceedings.  See Harris v. Gastelo, No. 2:19-cv-07052-CJC (JEM), Dkts. 20–3, 20–4.
     Respondent identified the document as:  21. Reporter's Transcript, 15 Volumes ("RT")

26   [4] The Court's citations to the RT and CT are to the pagination in those respective transcripts. All
     other citations to electronically filed documents refer to the CM/ECF pagination.

27
     [5] Harris was convicted of first-degree murder, and the jury found the same firearm and gang

28   allegations to be true.  RT at 4806–07.

                                                     2

On July 1, 2015, Petitioner admitted that he had one (1) prior serious or violent felony conviction (Cal. Pen. Code § 667(a)(1)), three (3) prior convictions for which a prison term was served (Id., § 667.5(b)), and a prior strike conviction (Id., §§ 667(d), 1170.12(b)). RT at 6001–03. That same day, the court sentenced him to prison for a term of fifty-eight (58) years to life.[6] RT at 6007; CT at 26, 29.

Petitioner and Harris appealed their convictions to the California Court of Appeal. Lodgs. 2–6.[7] On October 27, 2017, the appellate court concluded that one (1) of Petitioner's prior prison term enhancements should be stayed and that he was entitled to an extra day of custody credit. Lodg. 1; People v. Harris, No. B266099, 2017 WL 4857007 (Cal. Ct. App. Oct. 27, 2019).[8] The judgment in Petitioner's case

---

[6] Harris, who was not charged with any prior-conviction allegations, was sentenced to forty-five (45) years to life. RT at 5704; CT at 1–13.

[7] The remaining numerically identified lodgments were lodged in conjunction with Respondent's Motion to Dismiss filed in Harris's federal habeas proceedings. Harris v. Gastelo, No. 2:19-cv-07052-CJC (JEM), Dkts. 8–9. Respondent identified the documents in that lodgment as follows:
1. California Court of Appeal Opinion filed on October 27, 2017 ("Lodg. 1")
2. [Harris]'s Opening Brief ("Lodg. 2")
3. [Petitioner]'s Opening Brief ("Lodg. 3")
4. Respondent's Brief ("Lodg. 4")
5. [Harris]'s Reply Brief ("Lodg. 5")
6. [Petitioner]'s Reply Brief ("Lodg. 6")
7. [Harris]'s Petition for Rehearing ("Lodg. 7")
8. [Petitioner]'s Petition for Rehearing ("Lodg. 8")
9. Docket for California Court of Appeal Case number B266099 ("Lodg. 9")
10. [Harris]'s Petition for Review in California Supreme Court case number S245621 ("Lodg. 10")
11. [Petitioner]'s Petition for Review in California Supreme Court Case number S245621 ("Lodg. 11")
12. Order Granting Petition for Review in California Supreme Court Case number 245621 ("Lodg. 12")
13. [Harris]'s Supplemental Opening Brief ("Lodg. 13")
14. [Petitioner]'s Supplemental Opening Brief ("Lodg. 14")
15. California Court of Appeal Opinion filed on April 26, 2018 ("Lodg. 15")
16. [Harris]'s Petition for Review in California Supreme Court case number S248979 ("Lodg. 16")
17. [Petitioner]'s Petition for Review in California Supreme Court case number S248979 ("Lodg. 16")
18. Review Denial Order for California Supreme Court case number S248979

[8] For ease of reference and where practical, the Court cites to electronically available state-court opinions and federal report and recommendations, instead of the lodged copies of those documents.

3

1    was affirmed in all other respects.  Harris, 2017 WL 4857007, at *1, *12.  Harris's

2    judgment was affirmed in full.  Id.

3         Petitioner and Harris petitioned for review of the California Court of Appeal's

4    decision in the California Supreme Court.  Lodgs. 10–11.  On January 31, 2018, the

5    state supreme court granted review and transferred the matter to the appellate court

6    to reconsider the judgments in light of California Senate Bill 620, which took effect

7    January 1, 2018, and gave trial courts discretion to strike certain firearm

8    enhancements.  Lodg. 12.

9         Petitioner and Harris filed supplemental briefs in the Court of Appeal.  Lodgs.

10   13–14.  On April 26, 2018, the appellate court again affirmed both judgments of

11   conviction, but it remanded to the Superior Court for reconsideration of their

12   sentences in light of Senate Bill 620, and for correction of Petitioner's sentence as

13   previously directed.  Lodg. 15; People v. Harris, No. B266099, 2018 WL 1960474

14   (Cal. Ct. App. Apr. 26, 2018).  Petitioner and Harris again filed petitions for review in

15   the California Supreme Court, which were summarily denied on August 8, 2018.

16   Lodg. 16–18.

17        On September 27, 2018, the Superior Court stayed one (1) of Petitioner's one-

18   year prior prison term enhancements (Cal. Pen. Code § 667.5(b)) and modified his

19   credits, but it declined to strike the firearm enhancement under Senate Bill 620.  CT at

20   31–32.  The court then resentenced Petitioner to prison for a term of fifty-seven (57)

21   years to life.  CT at 33.

22        On December 17, 2018, Petitioner filed a habeas petition in the Superior Court.

23   Lodg. C.[9]  The petition was denied on January 11, 2019, in a reasoned order.  Lodg.

24   D.

25   _____

26   [9] The remaining alphabetically identified lodgments were lodged in conjunction with Respondent's
     Answer filed in this case.  Respondent identifies the documents in that lodgment as follows:

27        C.  Habeas Corpus Petition, Los Angeles County Superior Court ("Lodg. C")
          D.  Minute Order, Los Angeles County Superior Court ("Lodg. D")

28        E.  Habeas Corpus Petition, California Court of Appeal case number B295723 ("Lodg. E")
          F.  Habeas Denial Order, California Court of Appeal case number B295723 ("Lodg. F")

1   On February 19, 2019, Petitioner filed a habeas petition in the California Court

2   of Appeal.  Lodg. E.  The petition was summarily denied on March 8, 2019.  Lodg. F.

3   On March 29, 2019, Petitioner filed a form[10] petition for resentencing under

4   California Penal Code section 1170.95[11] in the Superior Court.  CT at 35–37.  The

5   resentencing petition was denied on July 22, 2019, in a reasoned order.  CT at 202–03.

6   While his petition for resentencing was pending, on May 16, 2019, Petitioner

7   filed a habeas corpus petition in the California Supreme Court.  Lodg. G.  The state

8   supreme court denied the petition on July 31, 2019, with citation to In re Dixon, 41

9   Cal. 2d 756, 759 (1953) and a parenthetical explaining "courts will not entertain

10  habeas corpus claims that could have been, but were not, raised on appeal."  Lodg. H.

11  On August 2, 2019, Petitioner filed a notice of appeal from the denial of his

12  petition for resentencing under California Penal Code section 1170.95.  CT at 204.

13  **B.   PRIOR FEDERAL HABEAS PROCEEDINGS**

14  On September 18, 2019, Petitioner filed his first federal habeas Petition in this

15  Court.  Dunn v. Montgomery, No. 2:19-cv-08059-CJC (JEM), Dkt. 1.  On November

16  7, 2019, Respondent moved to dismiss the federal petition on abstention grounds.  Id.

17  at Dkt. 7.  On May 4, 2020, the assigned magistrate judge issued a Report and

18  Recommendation recommending that the motion be granted.  Id. at Dkt. 20; Dunn v.

19  Montgomery, 2020 WL 3065427 (C.D. Cal. May 4, 2020).  On June 8, 2020, the

20

21          G.  Habeas Corpus Petition, California Supreme Court case number S255844 ("Lodg. G")
            H.  Electronic Docket, California Supreme Court case number S255844 ("Lodg. H")

22          I.   Opening Brief, California Court of Appeal case number B300289 ("Lodg. I")
            J.   Opinion, California Court of Appeal case number B300289 ("Lodg. J")

23          K.  Habeas Corpus Petition, California Supreme Court case number S266008 ("Lodg. K")
            L.  Habeas Denial Order, California Supreme Court case number S266008 ("Lodg. L")

24  [10] The resentencing petition was a downloadable form petition/declaration prepared by Re: Store
    Justice (www.restorecal.org) a cosponsor of California Senate Bill No. 1437 legislation.  See People

25  v. Edwards, 48 Cal. App. 5th 666, 670 (2020).

26  [11] Senate Bill 1437 amended California Penal Code sections 188 and 189 to reduce accomplice
    liability for felony murder where the accomplice did not commit the act that killed the victim.

27  Senate Bill 1437 also added California Penal Code section 1170.95, which provides a procedure by
    which those already convicted of murder before the 2018 enactment of Senate Bill 1437 may seek

28  retroactive relief by filing a petition in the trial court.  Edwards, 48 Cal. App. 5th at 672.

1   district court accepted the findings and recommendations of the magistrate judge,

2   granted the motion to dismiss, and entered judgment dismissing the action without

3   prejudice.  Dunn v. Montgomery, 2020 WL 3065099 (C.D. Cal. June 8, 2020).  On

4   August 13, 2020, after Petitioner's appellate counsel filed a Wende[12] brief indicating

5   there were no non-frivolous issues to raise, the California Court of Appeal affirmed

6   the trial court's post-judgment order denying resentencing.  Lodgs. I, J; People v.

7   Dunn, B300289, 2020 WL 4691737 (Cal. Ct. App. Aug. 13, 2020).

8        On December 8, 2020, Petitioner filed a habeas petition in the California

9   Supreme Court.  Lodg. K.  The petition was denied on February 17, 2021.  Lodg. L;

10  Dkt. 1 at 41.  The court cited In re Clark, 5 Cal. 4th 750, 767–69 (1993) with a

11  parenthetical explaining "courts will not entertain habeas corpus claims that are

12  successive," and Dixon, 41 Cal. 2d at 759, with a parenthetical explaining "courts will

13  not entertain habeas corpus claims that could have been, but were not, raised on

14  appeal."  Lodg. L; Dkt. 1 at 41.

15  **B.    INSTANT FEDERAL HABEAS PETITION**

16       On March 5, 2021, Petitioner filed the instant Petition in this Court challenging

17  his conviction.  Dkt 1.[13]  On May 6, 2021, Respondent filed an Answer.  Dkt. 11.  On

18  May 19, 2021, Petitioner filed a Reply.  Dkt. 14.

19       On August 30, 2021, the Court issued a Report and Recommendation denying

20  the Petition.  Dkt. 16.  On September 17, 2021 Respondent filed Objections to the

21  Report and Recommendation.  Dkt. 17.  Petitioner has not filed a response.  The

22  Court issues this Final Report and Recommendation addressing Respondent's

23  Objections in footnotes 31 and 37.

24  _____

[12] People v. Wende, 25 Cal. 3d 436 (1979).

25

[13] As noted, Harris also challenged his conviction in federal habeas proceedings.  Harris v. Gastelo,
26  No. 2:19-cv-07052-CJC (JEM), Dkt. 1.  On November 25, 2020, the assigned magistrate judge
    issued a Report and Recommendation recommending this Court deny Harris's first amended
27  petition on the merits.  Id. at 22; Harris v. Gastelo, 2020 WL 7890673 (C.D. Cal. Nov. 25, 2020).
    This Court denied the petition and dismissed the action with prejudice on January 5, 2021.  Harris v.
28  Gastelo, 2021 WL 39628 (C.D. Cal. Jan. 5, 2021).

The matter thus stands submitted.

## III.

## SUMMARY OF FACTS

For a summary of the facts, this Court relies on the California Court of Appeal's opinion as those facts pertain to Petitioner's claims:[14]

### A. Background

Isaac "Ike" Gaston, Champagne Gaston, Izell Gaston, Frank Gaston and Keon Easley[15] were all siblings who lived together in an apartment in Compton, California, apartment G.  The apartment was a two-story unit with a fenced and gated patio.  Directly inside the front door was a living room area.  An internal staircase to the second floor was on the far wall across from the front door.  A small bathroom was located in the far corner, near the staircase.  The apartment complex was in the territory of the Nutty Blocc Crip gang.  Ike was a member of the gang.  Izell, Champagne, Frank and Keon were all affiliated with the gang.

Harris, [Petitioner] and Grissett were all members of the Nutty Blocc gang.  Champagne had known Harris and Grissett since childhood. Harris's moniker was Ju-Ju; Grissett's moniker was Chop-Chop.[16] Champagne was also close with Jazzmine Harris, a blood relative of Harris.[17]   Izell had also known [Petitioner] for about 10 years; [Petitioner]'s moniker was "Mike Dog."

### B. The Shooting

On March 9, 2014, Champagne threw a party with Harris at the Gaston family apartment to celebrate the birthday of a friend of Harris, pay off

---

[14] The California Court of Appeal provided what appears to be identical factual summaries in Petitioner's first two appeals, and a procedural summary, but no factual summary, in Petitioner's third appeal.  See Harris, 2017 WL 4857007, at *2–*6; Harris, 2018 WL 1960474, at *2–*6; Dunn, 2020 WL 4691737, at *1–2.  The first appeal was vacated when the state supreme court granted review.  After an independent review of the trial record, the undersigned finds the summary in Petitioner's second appeal generally accurate.  Certain instances of conflicting testimony are noted where it is relevant to Petitioner's claims.

[15] To avoid confusion, the siblings will be referred to by their first names.

[16] A moniker is a gang nickname used by gang members to avoid detection by law enforcement.

[17] Also, Harris's siblings and relatives will be referred to by their first names.

bills, and raise money for the Gaston family to move.  Over 100 people attended the party, including members of the Nutty Blocc and Santana Blocc gangs.  Many of the Gaston siblings were present, including Ike, Izell, Frank and Keon.  Many of Harris's relatives and friends attended, including his brothers Darryl, Derrell, Darnell, sisters Darnesha and Samiaa, a cousin, and friends Rita Richardson and Jazmin Lopez.

The party was disrupted when Grissett started scaring people by stating he was going to shoot up the party.  Champagne told him to stop.  Later, Grissett began disparaging other gangs saying "f[uck] different gangs," "f[uck] Fronthood" and Santana gangs.[18]  At this point, Champagne told Grissett she was cancelling the party and she began yelling "the party's over," "everybody . . . go home."  She told Harris she was shutting down the party.  Harris told Champagne they were "going to shut down nothing," and told Ike "you better tell [Champagne] she ain't shutting down nothing."

The verbal dispute escalated into a series of physical altercations, culminating in a gun battle.  The first physical confrontation occurred at the apartment's gated patio.  When Harris blocked Champagne's entry through the patio gate, she pushed him to enter.  Then, as Champagne went into the apartment, Harris and Ike began fighting on the patio.  Harris threw the first punch at Ike and missed; Ike then punched Harris, knocking Harris to the ground.  The fight turned into a melee, with five to six Nutty Blocc affiliates, including Grissett, joining the attack on Ike.  Grissett escalated the fight by swinging a knife, stabbing Ike.  Frank attempted to defend his brother Ike by pushing the attackers away.  After the fight on the outside patio, Ike was woozy, stumbling and bleeding heavily from his head.  His brothers and cousins carried him into the apartment.

The second physical confrontation ensued inside the apartment.  Harris challenged Ike to fight again by stating "you got to catch my fade again."  Harris accused Ike of stabbing him, and lifted his arm to show a bleeding cut.  For the first time in the incident, a gun appeared.  In his hand, Ike held a gun pointing up, and he began waving it in a circular motion.[19]  Keon tried, without success, to take the gun away from Ike; Champagne

---

[18] The People's gang expert testified that the Fronthood and Santana gangs were not Nutty Blocc's enemies.

[19] Keon recalled seeing Ike holding a .44-caliber revolver before Ike was carried to the stairs and before Harris and Grissett came inside.  Keon later testified that he only noticed the gun in Ike's hand when Ike was on the stairs.

ran up the stairs and called the police. After the verbal challenge, another physical fight broke out in the living room involving Harris, his brothers and Grissett, battling Ike's brothers Izell and Keon. Grissett again swung a knife, cutting Izell above his right elbow. Izell and Frank were able to push Ike halfway up the internal staircase, away from the fight. Ike was bleeding profusely and semi-conscious. Frank forced some of the partygoers out of the apartment, including Harris and Grissett, and locked the door.

The quarrel did not end. [Petitioner], another Nutty Blocc gang member, joined the conflict for the first time. When [Petitioner] yelled[20] from outside the apartment, "Jazzmine, open the door, [bitch]," Jazzmine [Harris's relative] opened the door. [Petitioner] and then Harris entered and each fired multiple shots, [Petitioner] shooting first,[21] towards the staircase bearing Ike and his siblings Izell, Champagne, Keon and Frank. None of the siblings shot back. Ike was shot in the chest and front shoulder; the chest shot was fatal.

C. The Investigation

The night of the shooting, witnesses and bystanders were uncooperative with law enforcement. Ike's family members did not immediately tell law enforcement what they knew about the shooting because they did not want to be snitches or were scared for their lives. Indeed, Keon talked to the police at the hospital after the shooting but lied about his name and birthday because he was nervous and scared. That same night, Izell went with the police to the station but did not cooperate or identify the shooters because the shooters were active gang members and he thought he and his family could get hurt.

---

[20] Petitioner does not concede that he was the person who yelled from outside the apartment. Dkt. 1 at 14 ("… when Dunn allegedly knockd [sic] on the front door and demanded entry"), 15 ("Someone, perhaps Dunn, knocked on the front door and asked Jazzmine … to open the door"). While Champagne, Keon, and Izell all testified that they recognized Petitioner as the speaker, RT at 1027, 1324, 1705, Frank did not recognize the speaker's voice, RT at 2244.

[21] Petitioner notes the investigating officer could not conclusively determine who shot first. RT at 2530.

Forensic evidence suggested a "gun battle."[22]  The ballistic evidence was consistent with two people standing at or near the front door of apartment G, shooting into the apartment, one shooting a nine-millimeter handgun, the other a .32-caliber handgun.[23]   Additional spent casing, bullet and bullet fragments found on the patio outside the fence suggested that someone shot a nine-millimeter handgun from the walkway towards apartment G.[24]  The evidence was also consistent with another shooter firing a revolver from inside the apartment from an area near the front bathroom, using a cabinet as cover and firing towards the front door.[25] Finally, a bag of .44-caliber Smith & Wesson Special live rounds, and a single live round were found at the bottom of the stairs, and a holster for a large frame revolver was found in the upstairs bedroom.

The criminalist that examined the ballistic evidence from the crime scene and the bullet recovered from Ike's body opined that all three 9-millimeter casings marked R.P., were Remington Peters brand, and had been fired from the same firearm; all three .32-caliber cartridge cases stamped C.B.C., were Magtech brand, and had been fired from a second gun; the bullet fragments recovered from the exterior crime scene were all nine-millimeter luger caliber, and had been fired from the same gun (although he could not determine whether that was the same gun that had fired the nine-millimeter bullets or the gun that had fired the .32-caliber bullets). The bullet extracted from Ike's body was a .32-caliber bullet.

Harris was arrested on March 31, 2014 at an apartment in Compton, and Grissett was later arrested on June 5, 2014 at same location.  On June 5,

---

[22] Blood was found on the patio, inside the apartment near the front door, on the landing area, on the stair railing, on the wall coming down the stairs, the upstairs hallway, and in the living room; the highest concentration of blood was on the stairs.

[23] Ballistic evidence was found around and inside the apartment.  One .32-caliber shell casing stamped C.B.C. was located in front of the front door across from apartment G, two more .32-caliber C.B.C. shell casings were just inside the front door, and two 9-millimeter R.P. shell casings were in the apartment, one under the front door.

[24] Ballistic evidence was found outside apartment G.  A spent nine-millimeter R.P. casing was located on the sidewalk in front of a nearby apartment; impact marks suggested that the shooter had been standing near the casing, and was firing towards apartment G.  Another spent projectile that had struck the sidewalk suggested an additional bullet travelling towards apartment G.  A bullet lodged in a fence surrounding the patio, suggested another bullet travelling towards apartment G. Three additional bullet strikes and three holes in the fence suggested at least three more bullets fired towards apartment G.

[25] No casings were recovered, suggesting a revolver.  The ballistic evidence of strikes to the curio cabinet and a bullet hole in the television suggested at least two shots.

the police recovered a box of ammunition stamped "R.P." and Grissett's identification at that apartment.  When [Petitioner] was arrested on June 5, police seized gang-related items, namely, a hat, jacket and shirt bearing the Yankees insignia, and a phone book with gang monikers.

D. Gang Evidence

Los Angeles County Sheriff's Detective Scott Lawler testified as a gang expert, and described the Nutty Blocc Crips as a gang with 230–240 members, engaged in gun possession, shootings, narcotics sales, and witness intimidation.  Their common color is blue and they identify themselves with New York Yankees merchandise, and the letters "NY."  There is a hierarchy of gang members.  [Petitioner] is a high-ranking Nutty Blocc member; Harris and Grissett are members.[26]

Fear and respect are important concepts in gang culture.  Gangs must be feared by rival gang members and instill fear in the community to operate as a gang.  If a gang member is disrespected, this would be seen as weakness, thus a disrespected gang member would be expected to retaliate in a more aggressive manner: if "he was slapped, he'd have to punch; if he was punched, he'd have to stab; if he was stabbed, he'd have to shoot."  Shooting and killing someone who disrespected a gang member would be considered "putting in work for the gang" and would earn respect among fellow gang members.  A shooting of a fellow gang member who had acted disrespectfully would benefit the individual shooter by raising his status within the gang by creating fear and respect, and would benefit the gang by instilling fear and respect by enemy gangs, recruiting youths to the gang, and facilitating the expansion of the gang's territory.

E. Harris's Evidence

1. Forensic evidence

Criminalist Marc Scott Taylor, an expert on gunshot residue (GSR), examined GSR collected from Izell the night of the shooting, and found GSR on both hands, indicating that Izell either fired a weapon, was in the vicinity of a fired weapon, or came in contact with another source of GSR.  Taylor also reviewed the coroner's findings regarding Ike and concluded that the particles recovered from Ike's hands very likely came from a gunshot.

---

[26] Harris also admitted to another deputy on April 13, 2013 that he was a member of the Nutty Blocc gang with a moniker of Ju-Ju.

Taylor explained the production of GSR.  When a gun is fired, the chemicals in the primer explode in a puff of smoke, dispersing tiny particles, which are deposited on the hands of the shooter and nearby objects and people.  It can also be transferred to a person touching the gun fired or touching the gunshot wound, or touching a wall with a bullet strike.  GSR dissipates over time, normally lasting no more than five to seven hours.

GSR is more likely to get on another person in a confined place.  If multiple guns are being fired in a room, GSR may be deposited on a person standing within five feet of a shooter.  The presence of GSR does not indicate who fired first.

   2. Ballistic evidence

Bullet strikes were found on a building across the courtyard from the Gaston residence.  Theoretically, if someone was shooting from inside the Gaston residence, they could have fired those shots, "shooting high and wild."

   3. Harris's testimony

Harris testified.  He grew up in the Nutty Blocc area, and associated with the Nutty Bloccs since high school.  He was not a member of the gang and his tattoos were not gang-related.  He had known [Petitioner] since he was 10 years old and Grissett his whole life.  He knew "Mike Dog" [Petitioner] and "Chop-Chop" Grissett as associates of Nutty Blocc.  Harris had known Champagne and Izell since high school; both were members of Nutty Blocc.  He had previously met Ike at a party.

Champagne offered to host a party for Harris's friend.  Harris arrived at the party after 10:00 p.m. with his brothers Derrell and Darnell and a cousin.  A third brother Darryl arrived separately.  Soon after Harris arrived, he spoke to Ike who appeared "probably buzzed" and was not acting normally.  The partygoers were a mixture of gang and non-gang members.

Harris went outside to help Champagne with Grissett who had been walking around "banging on people."  Champagne was yelling that she wanted to shut down the party.  Ike came outside and argued with Champagne about shutting the party down before he had made money back for the drinks and food purchased for the party.  A fight began on the patio: Ike shoved Harris twice; Harris said "if you push me again, we

gonna fight." Ike hit Harris in the back of the head; Harris turned around and shoved Ike against the wall. Ike bit Harris on his right shoulder. When Harris tried to yank away, he fell on his back and Ike, swinging, landed on top of Harris. He did not see Grissett with a knife, did not know whether Grissett joined the fight and could not tell if Ike was bleeding. Ike was pulled off Harris and Ike said that he was going to get his gun. Harris got up and told his cousin and some other women to leave because Ike was getting a gun.

Harris left, but returned to the party to look for his brothers. He walked into the dimly[ ]lit apartment through an open door, and saw Ike, in the middle of the stairway with one of his brothers, and a group of people at the bottom of the stairs. When Ike began waving a long revolver, Harris ran toward the dining area. Gunshots went off from the living room area, by the stairs. Harris could not tell if Ike was firing his gun, whether anyone in the bathroom area at the base of the stairs was firing a gun, or the path of the bullets. Also, Harris did not see [Petitioner] that night. Harris denied that there was a second fight inside the living room and ever telling Ike "'I want to catch your fade.'" Harris also denied possessing, pointing or firing a handgun at the party.

After the gunshots stopped, Harris waited a few seconds, ran towards the gate, and saw his brother Darryl, with a gunshot wound to his right shoulder, in the bushes next to the patio.

### 4. Partygoer's evidence

Rita Richardson went to the party with Harris's sister Darnesha, arriving at about 8:00 p.m. At some point, there was a commotion, she and others ran inside the apartment, and the door was closed. As Rita was kneeling in the corner near the bottom of the stairs, the door opened, some people ran out, and the door was closed again. She then was pushed into a corner near a bathroom, the front door opened again, and a man, who she later identified as Ike, came in waving a big gun, struggling to hold on to it. Another man was trying to get the gun away. Ike fell onto her legs, the gun fell, and the man who had been trying to take the gun picked it up. Harris was not in the residence at this time. Rita ran out of the house, and saw Harris standing outside, shirtless. She heard a gunshot as she stood in front of another apartment, ran to the parking area, heard another gunshot, jumped the complex fence, and then ran out of the complex to the street. Harris and his brother, who was bleeding, were outside on the street.

Darryl Slaughter, Harris's brother, arrived at the party about 10:00 p.m. While inside the apartment, he heard a commotion from the patio area, went outside, heard yelling and then heard 12 to 15 gunshots. Panicking, he ran away from the party and was shot in the upper back. Darryl fell into a bush and then Harris picked him up and carried him to the street. That evening, Darryl never saw Harris with a gun or shooting, nor did he see [Petitioner] at the party or with a gun.

Harris's friend, Jazmin Lopez, arrived at the party about 9:30 p.m. At some point when she was on the patio, she noticed a woman yelling about a situation that had happened. No more than 15 minutes later, a man pushed Harris, the two began a fistfight, and more than 10 people began fighting. She then left and sat in her parked car, and within 10 minutes Harris walked out onto the street with his brother who had been shot.

Darnesha, Harris's older sister, arrived at about 9:00 or 9:30 p.m. Inside, she saw Izell dancing, armed with a gun in his waistband. She heard a commotion outside, went outside where she saw Ike and Harris. She went back in, the front door closed, and then reopened, there was another commotion, someone said "go" and she left. Once outside, around the corner from the unit, she heard shots coming from an unknown direction and ran away. Harris was not with her at the time of the shooting. She did not see [Petitioner] at the party.

Samiia Farris, Harris's stepsister, arrived at about 10:00 p.m. About an hour later, she saw a group of people fighting on the patio. She did not see Harris involved in the fight. As she ran out to the complex entrance, she heard gunshots. Harris and Darryl were running a few feet behind. She did not see [Petitioner] at the party.

F. [Petitioner]'s evidence

[Petitioner] called witnesses who impeached prosecution witnesses with prior statements or challenged the adequacy of the police investigation.

### 1. Gunshot residue evidence

Debra Kowal, a criminalist with the Los Angeles County Coroner's Office, analyzed the GSR kit collected from Ike. She explained that when a gun is discharged, particles are produced either made up of lead, barium and antimony ("three-component particles"), lead and barium or lead and antimony ("two-component particles"), or just lead (a "single-component

particle"). She found several consistent particles[27] of GSR recovered from Ike's right hand and "many" recovered from his left hand; accordingly Ike may have discharged a firearm, or had his hands in the vicinity of a firearm that had been discharged or received the particles from an environmental source. She would expect to find GSR around the wound of a person shot by someone standing 20 feet away. In a 15.5-foot by 19-foot room where multiple guns had been fired, she would expect to see GSR possibly "on everyone in a room that size." Hypothetically, if Ike had fired a .44-caliber handgun, she would expect to see combinations of all three components, two of the three components, or a single component. Also, bagging hands is an appropriate way to preserve evidence. She also examined Izell's GSR kit and found particles characteristic of GSR. The positive GSR tests for Ike and Izell do not necessarily mean that Ike or Izell had fired a weapon.

Harris, 2018 WL 1960474, at *2–*6.

## IV.

## PETITIONER'S CLAIMS FOR RELIEF

Petitioner presents the following five (5) claims:

1. The trial court erred by instructing the jury that a lawful occupant of a home has the right to use deadly force to protect people and property from an intruder (Claim One);

2. The trial court erred by instructing the jury that a person does not have a right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force (Claim Two);

3. The trial court's failure to instruct the jury with CALCRIM No. 522 violated Petitioner's constitutional right to have the jury fully instructed on all lesser-included offenses (Claim Three);

---

[27] A "consistent" particle of GSR would be one of the two-component particles, or a single-component particle, such as lead.

4. The trial court violated Petitioner's constitutional right to have the jury instructed on lesser-included offenses when it failed to instruct the jury on manslaughter based on a heat of passion (Claim Four); and

5. The trial court violated Petitioner's constitutional rights when it denied his request to call a toxicologist to prove the victim's state of mind (Claim Five).

Dkts. 1 at 5–7, 11–26; 14 at 2–5.

Respondent contends Petitioner's claims fail on their merits.[28]  Dkt. 11 at 2–3, 13–14, 18–28, 32–46.

# V.

# STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas relief on a claim adjudicated on its merits in state court unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Clearly established Federal law" for purposes of § 2254(d)(1) consists of "the holdings, as opposed to the dicta, of th[e] [United States Supreme] Court's decisions" in existence at the time of the state court adjudication.  Williams v. Taylor, 529 U.S. 362, 412 (2000).  However, "circuit court precedent may be 'persuasive' in demonstrating what law is 'clearly established' and whether a state court applied that law unreasonably."  Maxwell v. Roe, 628 F.3d 486, 494 (9th Cir. 2010).

A state court decision rests on an "unreasonable application" of federal law for purposes of § 2254(d)(1) where a state court identifies the correct governing rule, but

---

[28] In addition to failing on the merits, Respondent argues Claims Two through Five are procedurally defaulted, as explained below.

1   unreasonably applies that rule to the facts of the particular case.  Andrews v. Davis,

2   944 F.3d 1092, 1107 (9th Cir. 2019) (citing Williams, 529 U.S. at 407–08).  "It is not

3   enough that a federal habeas court concludes 'in its independent judgment that the

4   relevant state-court decision applied clearly established federal law erroneously or

5   incorrectly.'"  Id. (citing Lockyer v. Andrade, 538 U.S. 63, 76 (2003)). "The state

6   court's application of clearly established law must be objectively unreasonable."

7   Lockyer, 538 U.S. at 75.

8          Overall, AEDPA established "a difficult to meet ... and highly deferential

9   standard for evaluating state-court rulings, which demands that state-court decisions

10  be given the benefit of the doubt."  Cullen v. Pinholster, 563 U.S. 170, 181

11  (2011) (internal citation and quotation marks omitted).  "That deference, however,

12  'does not by definition preclude relief.'"  Andrews, 944 F.3d at 1107 (citing Miller-El

13  v. Cockrell, 537 U.S. 322, 340 (2003)).

14         Where the last state court disposition of a claim is a summary denial, this Court

15  must review the last reasoned state court decision addressing the merits of the claim

16  under AEDPA's deferential standard of review.  Maxwell, 628 F.3d at 495; see also

17  Berghuis v. Thompkins, 560 U.S. 370, 380 (2010); Ylst v. Nunnemaker, 501 U.S. 797,

18  803–04 (1991).

19         Here, the California Court of Appeal's April 26, 2018 opinion on direct review

20  stands as the last reasoned decision with respect to Claim One.  See Harris, 2018 WL

21  1960474, at *8–*10.  Hence, that claim will be reviewed under AEDPA's deferential

22  standard of review for claims "adjudicated on the merits."  28 U.S.C. § 2254(d);

23  Harrington v. Richter, 562 U.S. 86, 99 (2011).

24

25

26

27

28

1    The California Supreme Court rejected Claims Two[29] through Five[30] on

2    procedural grounds only.  Lodg. H, L.  Accordingly, Respondent argues Claims Two

3    through Five are procedurally defaulted.  Dkt. 11 at 2, 13, 28–32.  However, because

4    Petitioner's claims are easily resolved on the merits, while the procedural default

5    arguments are much more complex, in the interest of judicial economy, the Court

6    considers the claims on the merits rather than addressing the procedural default

7    issues.[31]  See Lambrix v. Singletary, 520 U.S. 518, 525 (1997); Franklin v. Johnson, 290

8    F.3d 1223, 1232 (9th Cir. 2002).

9

10

---

[29] Prior to the state supreme court's rejection of Claim Two, the superior court denied habeas relief on that claim because the jury instruction at issue was a correct statement of the law, and for the procedural reason that the claimed instructional error could have been, but was not raised on appeal. Lodg. D.  Respondent contends the Court should apply AEDPA deference to the merits portion of the trial court's denial.  Dkt. 11 at 13, 20.  As further explained below, the Court will consider the trial court's order, but, in an abundance of caution, will review the claim de novo.  See Hicks v. Covello, 2021 WL 2458784, *3 (C.D. Cal. Apr. 6, 2021) (declining to apply AEDPA deference to superior court decision denying claims both as procedurally barred and on the merits because supreme court did not address merits of claims but instead rejected them on purely procedural grounds).

[30] Respondent agrees that de novo review of Claims Three through Five is appropriate.  Dkt. 11 at 13, 20–21.

[31] In their Objections, Respondent cites an unpublished Ninth Circuit case, John v. McEwen, 777 F. App'x 193 (9th Cir. 2019), to argue that the Court must address the procedural default issue before issuing a Certificate of Appealability.  Dkt. 17 at 2.  Though John is not binding precedent, the Court will briefly address procedural default out of an abundance of caution.

    Here, it is not clear that Petitioner's claims are procedurally defaulted.  When a state court applies multiple procedural bars to multiple claims but does not indicate which procedural bar is applied to which claim, there can be no procedural default in federal court unless every procedural bar cited constitutes an adequate and independent ground to preclude federal habeas review.  Washington v. Cambra, 208 F.3d 832, 834 (9th Cir. 2000).

    Here, the California Supreme Court denied the state petition with two (2) citations:  (1) In re Clark, 5 Cal. 4th 750, 767–69 (1993) (courts will not entertain habeas corpus claims that are successive); and (2) In re Dixon, 41 Cal. 2d at 759 (courts will not entertain habeas corpus claims that could have been, but were not, raised on appeal).  Lodg. L.

    Respondent satisfied their burden with respect to the Dixon bar by citing to the Supreme Court's holding that the cited Dixon bar is adequate to bar federal review.  Johnson v. Lee, 578 U.S. 605, 606 (2016).  However, Respondent has failed to satisfy their burden with respect to the Clark successiveness bar because they do not cite a published Ninth Circuit case holding that the Clark successiveness bar satisfies the "independent and adequate" standard for procedural

1    When employing this procedure, the federal habeas court reviews claims not

2    addressed on the merits de novo rather than applying AEDPA's deferential standard

3    of review.  Cone v. Bell, 556 U.S. 449, 472 (2009); Lewis v. Mayle, 391 F.3d 989, 996

4    (9th Cir. 2004).  Under de novo review, the petitioner still bears the burden of

5    establishing that he is "in custody in violation of the Constitution or laws or treaties

6    of the United States."  28 U.S.C. § 2254(a); Johnson v. Zerbst, 304 U.S. 458, 468–69

7    (1938).  The Court will also review such claims, when appropriate, with reference to

8    the Court of Appeal's decision and the trial court's orders and rulings.  See Cone, 556

9    U.S. at 472; Frantz v. Hazey, 533 F.3d 724, 737–39 (9th Cir. 2008) (en banc) (even

10   when a state court does not address a constitutional issue, where the reasoning of the

11   state court is relevant to resolution of the constitutional issue, that reasoning must be

12   part of a federal habeas court's consideration); Williams v. Rhoades, 354 F.3d 1101,

13   1106 (9th Cir. 2004) (federal habeas court may consider reasoning of state trial court

14   where relevant to analysis); Gonzalez v. Johnson, 2020 WL 4808939,  at*8 n.7 (C.D.

15   Cal. July 6, 2020) (de novo review is guided by Frantz); Williams v. Montgomery, 2018

16   WL 6184899, at *8 (C.D. Cal. Oct. 24, 2018) (under Frantz, "review is informed by

17   the California Court of Appeal's decision, to the extent that the federal claim is tied to

18   that decision").

## VI.

## DISCUSSION

**A.   JURY INSTRUCTION CLAIMS**

22   In Petitioner's first four (4) claims for relief, he alleges challenges to the jury

23   instructions given at trial, and to the trial court's failure to give other instructions.

24   These claims are subject to the same general principles of federal habeas law.

25   ///

26   ///

27

28   default, and the Court has found none.  Accordingly, Respondent has not shown that both
     procedural bars cited by the California Supreme Court are independent and adequate.

19

1        **1.     Applicable law**

2        To merit habeas relief based on an erroneous jury instruction, a petitioner must

3    show that "the ailing instruction by itself so infected the entire trial that the resulting

4    conviction violates due process." <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 (1991) (citation

5    omitted); <u>see also</u> <u>Waddington v. Sarausad</u>, 555 U.S. 179, 191 (2009); <u>Henderson v.</u>

6    <u>Kibbe</u>, 431 U.S. 145, 154 (1977).  Instructional errors must be considered in the

7    context of the instructions as a whole and the trial record. <u>McGuire,</u> 502 U.S. at 72;

8    <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973). "Where the alleged error is the failure

9    to give an instruction the burden on petitioner is 'especially heavy,'" <u>Hendricks v.</u>

10   <u>Vasquez</u>, 974 F.2d 1099, 1106 (9th Cir. 1992) (as amended) (<u>quoting</u> <u>Kibbe</u>, 431 U.S.

11   at 155), because "[a]n omission, or an incomplete instruction, is less likely to be

12   prejudicial than a misstatement of the law." <u>Kibbe</u>, 431 U.S. at 155.  Additionally,

13   habeas relief is warranted only where the error had "substantial and injurious effect or

14   influence in determining the jury's verdict." <u>Hedgpeth v. Pulido</u>, 555 U.S. 57, 58, 61–

15   62 (2008) (per curiam) (<u>quoting</u> <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993)); <u>see</u>

16   <u>also</u> <u>Clark v. Brown</u>, 450 F.3d 898, 905 (9th Cir. 2006) (as amended).

17       **2.     Claim One: right-to-eject-trespasser instruction**

18       In Claim One, Petitioner contends that the trial court erred by instructing the

19   jury that a lawful occupant of a home has the right to use deadly force to protect

20   people and property from an intruder.  Petitioner contends there was no factual basis

21   to support the instruction, and giving the instruction unfairly relieved the prosecution

22   of its burden of proving he did not act in self-defense or an unreasonable belief for

23   self-defense.  He explains that he was "ever present" when the party stopped and he

24   paid to attend the party like everyone else, making him a "party goer and not an

25   'intruder.'"  Petitioner references CALCRIM Nos. 3475 and 3476.  Dkt. 1 at 5, 11–19;

26   Dkt. 14 at 2.

27   ///

28   ///

1     **a. Background and state court decision**

2   The California Court of Appeal provided the following background regarding

3 Petitioner's claim:

> 4  [. . .]  The modified version of CALCRIM No. 3475 the trial court gave
> 5  the jury was phrased as follows: "The lawful occupant of a home may
>   request that a trespasser leave the home.  If the trespasser does not leave
> 6  within a reasonable time and it would appear to a reasonable person that
> 7  the trespasser poses a threat to the home or the occupants, the lawful
>   occupant may use reasonable force to make the trespasser leave.  [¶]
> 8  Reasonable force means the amount of force that a reasonable person in
> 9  the same situation would believe is necessary to make the trespasser leave.
>   [¶]  If the trespasser resists, the lawful occupant may increase the amount
> 10  of force he uses in proportion to the force used by the trespasser and the
> 11  threat the trespasser poses to the property.  [¶]  When deciding whether
>   the lawful occupant used reasonable force, consider . . . what a reasonable
> 12  person in a similar situation with similar knowledge would have believed.
> 13  If the lawful occupant's beliefs were reasonable, the danger does not need
>   to have actually existed.  [¶]  The right of a lawful occupant to defend
> 14  himself and his property is a relevant consideration in determining
> 15  whether a defendant may prevail when he seeks to negate malice
>   aforethought by asserting the affirmative defense of imperfect self-
> 16  defense.  <u>If the [ ] lawful occupant has a right to use force to defend</u>
> 17  <u>himself in his home, then [Petitioner] has no right of self-defense,</u>
>   <u>imperfect or otherwise</u>." ([Emphasis] added.)[32]
> 18
>
> 19  The trial court further instructed with CALCRIM No. 3476: "The
> 20  possessor of real property may use reasonable force to protect that
>   property from imminent harm.  A person may also use reasonable force
> 21  to protect the property of a family member or guest from immediate harm.
> 22  [¶]  Reasonable force means the amount of force that a reasonable person

23 [32] The court referenced <u>People v. Watie</u> (2002) 100 Cal.App.4th 866, 878 (cited in the use notes to
24 CALCRIM No. 3475), to support the proposition that the right to defend one's home may negate a
 defendant's claim of imperfect self-defense.  Specifically, the trial court quoted "the right of a victim
25 to defend himself and his property is a relevant consideration in determining whether a defendant
 may prevail when he seeks to negate malice afore thought [sic ] by asserting the affirmative defense
26 of imperfect [self-]defense.  [¶]  <u>If [the victim] had a right to use force to defend himself in his</u>
 <u>home, then defendant has [sic ] no right of self-defense, imperfect or otherwise</u>.  So that's the
27 language I'm intending to put in based on the case[.]" ([Emphasis] added.)  This language remains a
 correct statement of the law.
28

in the same situation would believe is necessary to protect the property from imminent harm.  [¶]  When deciding whether the possessor of real property used reasonable force, consider all the circumstances as they were known to and appeared to him and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the possessor of real property's beliefs were reasonable, the danger does not need to have actually existed."

Harris, 2018 WL 1960474, at *9.

The state appellate court then rejected Petitioner's claim as follows:

The trial court did not deprive [Petitioner] of his self-defense defense by giving the modified versions of CALCRIM Nos. 3475 and 3476.  The instructions do not misstate the law.  (See People v. Watie, supra, 100 Cal.App.4th at p. 878 ["If [victim] had a right to use force to defend himself in his home, then defendant had no right of self-defense, imperfect or otherwise."].)  Nor did the instruction compel the jury to find that [Petitioner] was a trespasser.  Rather, the instructions merely summarized the legal principles that the jury should apply if it believed [Petitioner] was a trespasser when he entered the house on the night he killed Ike.  In a separate instruction, the trial court told the jury that "[s]ome of [the] instructions may not apply, depending on your findings about the facts of the case.  Do not assume just because I give a particular instruction that I am suggesting anything about the facts.  After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."  Thus, if the jury found that [Petitioner] was not a trespasser, the jury would have understood that the modified CALCRIM Nos. 3475 and 3476 instructions did not apply.

Nor did the instructions lower the prosecution's burden of proof.  Neither CALCRIM No. 3475 nor CALCRIM No. 3476 specifically address or allocate the burden of proof.  The trial court instructed the jury in CALCRIM Nos. 103 and 220: "A defendant in a criminal case is presumed to be innocent.  This presumption requires that the People prove a defendant guilty beyond a reasonable doubt.  Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt."  The court reminded the jury of the People's burden

22

of proof in the instructions on self-defense,[33] first degree murder,[34] and voluntary manslaughter.[35]   Finally, the prosecutor explicitly acknowledged that she had to prove that [Petitioner] was not acting in self-defense.

Even though the instructions did not direct the jury to find that he was a trespasser, [Petitioner] argues CALCRIM Nos. 3475 and 3476 undermined his defense because they permitted the jury to find he was a trespasser; in [Petitioner]'s view, there was no substantial evidence on which the jury could so find.  After reviewing the record, we do not share [Petitioner]'s view.  There was evidence, that although Harris had been invited to the party, the invitation was revoked when Champagne yelled "the party's over" and told everyone to go home.  Defendants' permission to stay was certainly revoked when Frank forced some of the partygoers, including Harris and Grissett, out of the apartment and locked the door. [Petitioner] and Harris were only able to obtain re-entry when [Petitioner] screamed for Harris's cousin to "open the door, bitch."  This evidence was sufficient to deserve consideration by the jury as to whether [Petitioner] was in fact a trespasser.  (See People v. Williams (2015) 61 Cal.4th 1244, 1263 ["'[s]ubstantial evidence'" that warrants jury instruction is "'evidence sufficient to "deserve consideration by the jury"'"].)[36]

---

[33] The trial court instructed the jury in CALCRIM No. 505 (Justifiable Homicide: Self–Defense): "[Petitioner] is not guilty of murder or manslaughter if he was justified in killing someone in self-defense. . . . [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the killing was not justified.  If the People have not met this burden, you must find [Petitioner] not guilty of murder or manslaughter."

[34] The trial court instructed the jury in CALCRIM No. 521 (First Degree Murder [Pen. Code, § 189]): "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime.  If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder."

[35] The trial court instructed the jury in CALCRIM No. 571 (Voluntary Manslaughter: Imperfect Self–Defense or Imperfect Defense of Another-Lesser Included Offense [Pen. Code, § 192] ): "The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense.  If the People have not met this burden, you must find [Petitioner] not guilty of murder."

[36] Insofar as [Petitioner] argues that there was insufficient evidence to support CALCRIM No. 3476 regarding the right to defend property, any error is harmless as the instruction was repetitive of CALCRIM No. 3475.  Moreover, as noted, the jury was instructed that some of the instructions might not apply, and directed to follow the instructions that apply to the facts found.  (See CALCRIM No. 200, cited in footnote 15, ante.)  On this record, reversal is not required because it was not reasonably probable that without CALCRIM No. 3476 the result would have been more favorable to [Petitioner].

1    Harris, 2018 WL 1960474 at, *9–*10.

2            **b.**     **Analysis**

3          As noted above, Claim One is subject to AEDPA's deferential standard of

4    review.  For the purposes of determining "clearly established Federal law" under

5    AEDPA, McGuire and its progeny stand for "the broad proposition that an

6    erroneous jury instruction can rise to the level of constitutional error if it 'so infected

7    the entire trial that the resulting conviction violates due process.'"  Brewer v. Hall, 378

8    F.3d 952 (9th Cir. 2004) (quoting McGuire, 502 U.S. at 72).  The Court of Appeal's

9    rejection of Petitioner's arguments that (1) CALCRIM No. 3475 was factually

10   unsupported and (2) CALCRIM Nos. 3475 and 3476 lowered the prosecution's

11   burden of proof was not contrary to the relevant principle established in McGuire.

12         First, as the state court explained, there was evidence that Petitioner, along with

13   the other partygoers, was a trespasser, thus warranting CALCRIM No. 3475.  After

14   Grissett insulted rival gangs and threatened to "shoot up [the] party," Champagne told

15   everyone that the party was over.  RT at 1007–08, 1009 ("I was saying we [were] going

16   to shut down the party"), 1010, 1313–14 (witness agreeing that Champagne told him

17   she wanted to shut down the party, or heard her saying that she wanted to shut it

18   down), 2234 (witness "heard [Champagne] saying she wanted to shut the party

19   down"), 2418, 2431.  While Ike was bleeding and "woozy" inside the apartment,

20   Frank pushed many of the attendees out of the apartment, and he closed and locked

21   the front door.  RT at 1023–24, 1319–20, 1703–04 ("[Frank] got everybody -- we all

22   got everybody out the door, and Frank closed the door"), 2234, 2243 ("whoever was

23   in the house, they [had] to stay in the house"; "whoever was out the house, they

24   [were] out the house"), 2254–55).  The jury could have reasonably inferred from this

25   evidence that Ike and his siblings clearly communicated to Petitioner and others that

26   the party had ended and that they no longer had permission to re-enter the apartment.

27

28

1    Accordingly, given the evidence that could support a finding that Petitioner was a

2    trespasser, the trial court's decision to instruct the jury with CALCRIM No. 3475

3    could not have "so infected" the trial that Petitioner's resulting conviction violated

4    due process.

5           Second, as the court noted, neither instruction, on its face, purported to

6    allocate the burden of proof.  See, e.g., Camacho v. Asuncion, 2020 WL 8251400, *10

7    (C.D. Cal. Nov. 13, 2020) ("nothing in CALCRIM 3475 created a mandatory

8    presumption or impermissibly lessened the prosecutor's burden of proof"; collecting

9    similar cases).   In fact, numerous other instructions repeatedly explained the burden

10   to the jury, and the prosecutor defense counsel reiterated the concept to the jury.  See

11   Harris, 2018 WL 1960474, at *10; RT at 3950–51, 3958, 3966–67, 3977, 4203–04,

12   4241, 4246, 4250–51, 4269–70, 4278, 4280–82, 4284–85, 4289–90, 4296–97.

13   Moreover, the jury was specifically instructed that some instructions may not apply,

14   depending on its findings about the facts of the case.  RT at 4268.  As explained by

15   the state court, CALCRIM Nos. 3475 and 3476 merely summarized the legal

16   principles that the jury should apply "if" it believed Petitioner was a trespasser or Ike

17   was acting in defense of property.  See Harris, 2018 WL 1960474, at *9 (emphasis in

18   original).  Therefore, both in isolation and when "considered in the context of the

19   instructions as a whole and the trial record," CALCRIM Nos. 3475 and 3476 did not

20   effectively lower the prosecution's burden of proof such that Petitioner's conviction

21   violated due process.  See McGuire, 502 U.S. at 72

22          Relatedly, any possible error in giving the instructions was likely harmless.

23   Even if there was no evidence that Petitioner was a trespasser or that Ike acted to

24   protect property, it is presumed that the jury would have followed the instruction that

25   some instructions would not apply depending on the jury's findings.  RT at 4268; see

26   Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985) (the Supreme Court "presumes that

27   jurors, conscious of the gravity of their task, attend closely [to] the particular language

28   of the trial court's instructions in a criminal case and strive to understand, make sense

1    of, and follow the instructions given them"); <u>Martinez v. Horel</u>, 2010 WL 2104664,

2    *18 (C.D. Cal. Apr. 20, 2010) (to the extent an instruction was inapplicable to

3    petitioner's case, there was no prejudice because jury was presumed to follow

4    instruction to "[d]isregard any instruction which applies to facts determined by you

5    not to exist").

6          Further, there was also evidence from which the jury could infer that Petitioner

7    did not shoot and kill in self-defense.  Izell, Champagne, and Keon testified that

8    Petitioner started shooting as soon as he came into the apartment after the front door

9    was unlocked.  RT at 1038, 1326, 1333, 1708, 1710–12; Dkt 1 at 11 ("there was

10   testimony to support the theory [Petitioner] entered the residence with a gun in his

11   hand and immediately shot Isaac Gaston").  Also, the siblings testified that no shots

12   were fired toward Petitioner at any time.  RT at 1039, 1330–31, 1712, 2191, 2258,

13   2295.  Given the support for the theory that Petitioner did not kill Ike in self-defense,

14   there is no reasonable probability that the jury would have returned a more favorable

15   verdict even if it had not been instructed with CALCRIM Nos. 3475 and 3476.  <u>See</u>

16   <u>Brecht</u>, 507 U.S. at 639 (finding harmless error in part because "the State's evidence

17   of guilt was, if not overwhelming, certainly weighty"); <u>Harden v. Lizarraga</u>, 2019 WL

18   12379550, *2 (C.D. Cal. Sept. 8, 2019) (petitioner did not meet habeas burden of

19   showing harmful instructional error in light of testimony against him).

20         Hence, the California Court of Appeal's rejection of Petitioner's instructional-

21   error claim was not "contrary to, or . . . an unreasonable application of, clearly

22   established Federal law," and any error would have been harmless.  <u>See</u> 28 U.S.C.

23   § 2254(d)(1); <u>Brecht</u>, 507 U.S. at 639.  Accordingly, habeas relief is not warranted on

24   Claim One.

25         **3.     Claim Two: provocation instruction**

26         In Claim Two, Petitioner contends that the trial court erred by instructing the

27   jury that a person does not have a right to self-defense if he provokes a fight or

28

26

1  quarrel with the intent to create an excuse to use force, under CALCRIM No. 3472.

2  Dkt. 1 at 5–6, 20–23; Dkt. 14 at 2–3.

3                    a.       **Background and state court decision**

4        The trial court instructed the jury with CALCRIM No. 3472: "A person does

5  not have the right to self defense if he provokes a fight or quarrel with the intent to

6  create an excuse to use force." RT at 4286.

7        The jury was also instructed with CALCRIM No. 3471, which stated in relevant

8  part:

9          [I]f the defendant used only non[-]deadly force and the opponent
           responded with such sudden and deadly force, [that] the defendant could
10         not withdraw from the fight, then defendant had the right to defend
           himself with deadly force and was not required to try to stop fighting or
11         communicate the desire to stop to the opponent or give the opponent a
           chance to stop fighting.
12

13  RT at 4286.

14        The prosecutor cited CALCRIM No. 3472 and argued:

15          So when [Petitioner] and [Harris] returned to Ike's house with the
            intent to fight or shoot, that's provoking.  You don't get [t]o go to
16          somebody's house with the intent to beat the you know what out of
            them, or fire a gun at them.  Then when they pull a gun at you to protect
17          themselves claim self-defense.  That's not how the law works.  People
            are allowed to defend themselves in their home.
18

19

20  RT at 3937.

21        Petitioner's counsel did not address self-defense in his argument.  Instead,

22  counsel focused on attacking the credibility of the Prosecution's witnesses and argued

23  that there was no credible evidence that Petitioner committed the crimes or "that he

24  was even there." RT at 4003–04.  He did note that there was a "gun battle," and that

25  if the jury believed Petitioner was part of that gun battle, but it didn't believe the

26  prosecution's "rendition of what happened," then they could reasonably conclude it

27  was manslaughter instead of murder.  Id.  However, counsel did not otherwise argue

28

                                          27

1   that Petitioner acted in self-defense or for the jury to consider any lesser offenses, and

2   in fact explicitly noted "[he] was not asking for that."  Id.

3        The superior court rejected Petitioner's claim on habeas review because "giving

4   [of] the jury instruction, Cal Crim 3472- this is a correct statement of the law," and for

5   the procedural reason that the claimed instructional error could have been, but was

6   not raised on appeal.  Lodg. D.  Thereafter, the state supreme court denied relief

7   solely on procedural grounds. Lodg. H.

8            **b.   Analysis**

9        As an initial matter, the state superior court's conclusion that the instruction

10  was correct under state law is binding on this Court, even on de novo review.  See

11  Bradshaw, 546 U.S. at 76; Gonzalez, 394 F. App'x at 415–16; McNeely v. Sherman,

12  2021 WL 1391562, *4 (N.D. Cal. Apr. 13, 2021) (state court's "rejection of

13  petitioner's interpretation of state law and its holding that CALCRIM No. 3472

14  correctly stated California law are interpretations of state law that bind the federal

15  court in habeas review"); see also, e.g., Miller v. Baldwin, 723 F. App'x 408, 410 (9th

16  Cir. 2018) (federal habeas court bound by state courts' determinations of state law,

17  even on de novo review); Allen v. Montgomery, 2020 WL 5887015, *12 (C.D. Cal.

18  July 28, 2020) (even though review of petitioner's habeas claim was de novo, federal

19  court bound by state court's determination under state law).

20       Moreover, the instruction did not deprive Petitioner of his self-defense theory.

21  Petitioner essentially asks this Court to read CALCRIM NO. 3472 in isolation.  Doing

22  so, the instruction appears to preclude self-defense where a defendant provoked a

23  fight in order to create a reason to use force.  RT at 4286.  However, a federal court

24  may not review an instruction "in artificial isolation," but must consider the

25  instruction "in the context of the overall charge" to the jury.  Middleton v. McNeil,

26  541 U.S. 433, 437 (2004); McGuire, 502 U.S. at 72.  When CALCRIM No. 3472 is

27  read together with the instruction that immediately preceded it, CALCRIM No. 3471,

28  it is clear that even a defendant who started a fight may have a right to self-defense,

such as in the instance where an opponent responded with such force that withdrawal was not possible.  RT at 4285–86.  Indeed, the trial court instructed the jury to "pay careful attention to all of these instructions and consider them together."  RT at 4267.  Accordingly, in consideration of the overall instructional charge to the jury, Petitioner is not entitled to habeas relief.  See McNeil, 541 U.S. at 437; McGuire, 502 U.S. at 72; Kenney v. Brazelton, 2017 WL 11480151, *9 (N.D. Cal. Dec. 18, 2017) ("[T]he trial court's decision to give the challenged instructions did not deprive petitioner of his right to a fair trial.  Neither CALCRIM No. 3471 nor CALCRIM No. 3472 precluded the jury from finding that petitioner acted in self-defense, imperfect or otherwise.  Rather, they stated only that under specified circumstances, petitioner could not legitimately claim self-defense.")

Finally, even if Petitioner could establish that there was error, he has failed to show prejudice.  As noted, counsel did not argue self-defense; instead, he argued "straight acquittal" because witnesses lie and there was no credible evidence Petitioner committed the crimes or was there.  RT at 4004.  Given counsel's failure to press the self-defense argument, there is no reasonable probability that the jury would have returned a more favorable verdict, but for the inclusion of CALFRIM No. 3472.  See Brecht, 507 U.S. at 639; Harden, 2019 WL 12379550, at *2; Duenas, 2017 WL 5608082, at *12.

Hence, Petitioner has failed to establish constitutional error for which federal habeas relief can be granted, and any assumed instructional error would have been harmless.  Habeas relief is not warranted on Claim Two.

### 4.     Claims Three and Four: lesser-included instructions

In Claims Three and Four, Petitioner alleges the trial court's failure to give lesser-included instructions violated his constitutional fair trial rights.  In Claim Three, Petitioner challenges the trial court's failure to instruct the jury with CALCRIM No. 522, regarding provocation.  Dkt. 1 at 6, 24; Dkt. 14 at 3.  In Claim Four, Petitioner contends the trial court erred when it failed to instruct the jury with CALCRIM No.

570, regarding the lesser-included offense of manslaughter based on a heat of passion. Dkt. 1 at 6, 25; Dkt. 14 at 3.

### a.      Background and state court decision

CALCRIM No. 522 (Provocation: Effect on Degree of Murder) provides:

> Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter].  The weight and significance of the provocation, if any, are for you to decide.  [¶]  If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder.  [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]  [¶] [Provocation does not apply to a prosecution under a theory of felony murder.]

Harris, 2018 WL 1960474, at *10 n.22.

Neither Petitioner's counsel, nor Harris's counsel, specifically requested CALCRIM No. 522.  On direct appeal, Harris alleged his attorney was ineffective for failing to request the instruction, and the state appellate court rejected the claim. Harris, 2018 WL 1960474, at *10.  Petitioner later raised the claim on his state habeas proceedings, and the state supreme court denied relief on procedural grounds only. Lodg. L.

CALCRIM No. 570 (Voluntary Manslaughter: Heat of Passion—Lesser Included Offense) provides:

> A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.
> The defendant killed someone because of a sudden quarrel or in the heat of passion if:
> 1. The defendant was provoked;
> 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment;
> AND

3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it.  While no specific type of provocation is required, slight or remote provocation is not sufficient.  Sufficient provocation may occur over a short or long period of time.

It is not enough that the defendant simply was provoked.  The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient.  In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

[If enough time passed between the provocation and the killing for a person of average disposition to "cool off" and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.]

The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion.  If the People have not met this burden, you must find the defendant not guilty of murder.

Judicial Council of California Criminal Jury Instruction, CALCRIM No. 570.

Harris's counsel requested the jury be instructed on heat of passion under CALCRIM No. 570.  RT at 3674.  The trial court considered the instruction as to both defendants and ruled there was no evidence of a "sudden heat or passion" as to either.  RT at 3692–93; Harris, 2018 WL 1960474, at *6 n.15.  Later, the trial court provided a lengthy discussion distinguishing the cases relied on by counsel, and reiterated its ruling that there was no evidence as to either defendant to support the instruction, and, specifically as to Petitioner, "there was nothing . . . [t]here was no evidence to show that he acted under any type of heat of passion or whatnot."  RT at 4310–17.  Harris raised the issue on appeal, but the state appellate court found it had

1 been waived.  Harris, 2018 WL 1960474, at *6 n.15.  Petitioner later raised the claim

2 on state habeas review, and the state supreme court rejected it on procedural grounds

3 only.  Lodg. L.

4              **b.     Additional relevant federal law**

5         The U.S. Supreme Court has never held that a defendant in a noncapital case is

6 entitled to a lesser-included offense instruction.  Beck v. Alabama, 447 U.S. 625, 638

7 n.14 (1980); Bortis v. Swarthout, 672 F. App'x 754 (9th Cir. 2017) ("There is no

8 Supreme Court precedent establishing that a state trial court is required to instruct on

9 lesser included offenses in noncapital cases.").  Furthermore, the Ninth Circuit held

10 that a state court's failure to instruct on a lesser included offense in a noncapital case

11 does not present a federal constitutional question cognizable in a federal habeas

12 proceeding.  Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000).

13        However, under the Due Process Clause, a petitioner's right to a fair trial

14 includes the opportunity to present a complete defense.  California v. Trombetta, 467

15 U.S. 479, 485 (1984).  In Mathews, the Supreme Court held that as a general

16 proposition, a defendant is entitled to "an instruction as to any recognized defense for

17 which there exists evidence sufficient for a reasonable jury to find in his favor."

18 Mathews v. United States, 485 U.S. 58, 63 (1988).  The Ninth Circuit views these

19 claims—where the petitioner challenges a trial court's failure to instruct on the

20 defense's theory of the case—as distinct from claims challenging a failure to sua

21 sponte instruct on lesser included offenses.  See Solis, 219 F.3d at 929.  In fact, the

22 Ninth Circuit has held that a trial court's failure to instruct the jury on a reasonably-

23 supported defense violates clearly established federal law.  See Bradley v. Duncan, 315

24 F.3d 1091, 1098–1100 (9th Cir. 2002) (citing Conde v. Henry, 198 F.3d 734, 739 (9th

25 Cir. 1999)).  The failure to instruct on a defense theory rises to the level of

26 constitutional error only if "the theory is legally sound and the evidence in the case

27 makes [the theory] applicable."  Clark, 450 F.3d at 904–05 (citation omitted).

28 Furthermore, petitioners must show that any alleged error was prejudicial, i.e., that it

1  had a "substantial and injurious effect or influence in determining the jury's verdict."

2  Bradley, 315 F.3d at 1099 (quoting Brecht, 507 U.S. at 637).

3          **c.**    **Analysis**

4        As an initial matter, the trial court's failure to sua sponte instruct the jury on

5  lesser-included offenses in Petitioner's case is not cognizable on federal review

6  because Petitioner's case was noncapital.  See, e.g., Solis, 219 F.3d at 929.

7  Accordingly, to succeed on Claims Three or Four, Petitioner must show that his right

8  to present a complete defense was violated by the trial court's failure to instruct on his

9  defense theory of provocation or heat-of-passion.[37]

10        Here, there is at least some evidence that Petitioner was provoked.  Multiple

11  witnesses testified that Ike brandished a gun at Petitioner and Harris during their

12  confrontation in the apartment.  RT at 1031–35, 1226, 1328, 1334, 2256.  Champagne

13  testified that neither Harris nor Dunn had guns in their hands during the initial

14  confrontation.  Id. at 1225–26.  Furthermore, the investigating Deputy could not

15

---

16  [37]     Respondent also contends that Claims Three and Four are Teague barred because they

17  would require a new rule of constitutional law be announced.  Dkt. 11 at 21–24; see Teague v. Lane, 489 U.S. 288.  The Court does not address this argument with respect to Claim Four because the Claim clearly fails on the merits, even if not barred by Teague.

18

19       In their Objections, Respondent also argues that the Court must address the Teague issue with respect to Claim Three before issuing a Certificate of Appealability.  Dkt. 17.  Claim Three,

20  however, is not necessarily Teague-barred.  In Teague, the Supreme Court held that a new rule of constitutional law cannot be applied retroactively on federal collateral review to upset a state conviction or sentence, unless the new rule forbids criminal punishment of primary, private

21  individual conduct or is a "watershed" rule of criminal procedure.  489 U.S. at 310–12.

22       As noted above, at the time Petitioner's conviction became final, the Supreme Court had

23  already held that a trial court's failure to instruct the jury on a reasonably-supported defense violates clearly established federal law.  Mathews v. United States, 485 U.S. 58, 63 (1988); see Bradley, 315

24  F.3d at 1098–1100 (citing Mathews for the proposition that "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable

25  jury to find in his favor" and recognizing that the Ninth Circuit has applied the standard to habeas petitions).

26       Accordingly, Petitioner's claim that the trial court's failure to instruct the jury on provocation

27  violated his due process rights would not necessarily be Teague-barred if Petitioner could show that provocation was a reasonably-supported defense, rather than simply a lesser-included offense.

28

1    determine who shot first. Id. at 2530. There was also evidence that Petitioner was

2    not provoked. Though Ike was holding a gun, he was bleeding, woozy, and unable to

3    stand. RT at 1031–35. Furthermore, other witnesses testified that Petitioner began

4    shooting immediately after the door was opened. See, e.g., RT at 1326, 1708. Still, a

5    reasonable jury might have found that Petitioner was provoked by Ike's initial

6    brandishing, or even firing, of the gun.

7        The problem with Petitioner's claims, however, is that neither provocation nor

8    heat of passion were related to Petitioner's theory of defense. As noted above,

9    Petitioner's trial counsel explicitly avoided arguing for lesser offenses in closing

10   argument. Trial counsel only noted that if the jury believed Petitioner was part of that

11   gun battle, but it didn't believe the prosecution's "rendition of what happened," then

12   they could reasonably conclude it was manslaughter instead of murder, but that "[he]

13   was not asking for that." RT at 4003–04. Furthermore, counsel directly told the trial

14   court that "to be honest . . . it's not my intention to get up and argue heat of passion .

15   . . nor . . . to argue very much self-defense[.]" RT at 3684. In response, and in ruling

16   on the heat of passion instruction, the trial court stated, "this is not even coming

17   close." RT at 3685. Indeed, Petitioner's trial counsel did not even request either

18   instruction at issue.[38] The trial court's failure to instruct the jury using CALCRIM

19   Nos. 522 and 570 could not have violated Petitioner's right to a complete defense

20   where the instructions were unrelated to Petitioner's defense theory.

21       Trial counsel's failure to argue for lesser-included offenses also makes it

22   difficult for Petitioner to establish that any assumed error would have not been

23   harmless. Any instructions on provocation and heat of passion would likely have had

24   little to no impact on the jury's determination where Petitioner's own trial counsel

25

26

_____

27   [38] The Court does not suggest that counsel's failure to request an instruction, by itself, precludes
     Petitioner from succeeding on his claims. Counsel's failure to request the instructions is cited for
     the limited purpose of demonstrating that neither provocation nor heat of passion were related to
28   Petitioner's defense theory.

34

1   appeared to discourage the jury from considering lesser offenses in his closing

2   argument.

3         Accordingly, habeas relief is not warranted on Claims Three and Four.

4   **B.    EXCLUSION OF EVIDENCE CLAIM**

5         In Claim Five, Petitioner contends that the trial court violated his constitutional

6   right to a fair trial when it denied his request to call a toxicologist to prove the victim's

7   state of mind.  Dkt. 1 at 6.

8         **1.    Background and state court decision**

9         Prior to trial, the prosecution filed a motion to exclude the results of a

10   toxicology test performed on Ike after his death.  RT at 4.  Petitioner's counsel argued

11   that the toxicology report was relevant because it explained that Ike's drifting "in and

12   out of consciousness" could have been caused by drugs instead of his head wound.  It

13   further explained why Ike was "agitated" and "anxious," why he struck Harris in the

14   earlier fight, and why he retrieved a gun.  RT at 6–7, 787–89, 1511–12.  Harris's

15   counsel argued that it was relevant to Harris's self-defense claim because it showed

16   Ike's "erratic behavior."  RT at 789–90.  The prosecutor stated that Ike's "somewhat

17   unconscious" state of mind was relevant but countered that how that state of mind

18   came to be was irrelevant.  RT at 791.

19         To assist with deciding the issue, the trial judge had the toxicologist the defense

20   wanted to call, John Treuting, testify in a California Evidence Code § 402 hearing.[39]

21   Treuting testified that Ike would have been under the influence of PCP; that PCP

22   causes bizarre reactions; that PCP is a hallucinogen; that PCP can give someone

23   "superhuman strength"; that the combination of drugs in Ike's system would have

24   disrupted his normal brain function; and that someone under the influence of PCP

25

26

---

27   [39] California courts conduct 402 hearings outside the presence of the jury to decide preliminary
questions of fact upon which the admissibility of evidence depends.  People v. Superior Court
28   (Blakely), 60 Cal. App. 4th 202, 209 n.6 (1997); Cal. Evid. Code § 402(b).

1   may react disproportionately to what they believe to be a threat.  RT at 1522–27,
2   1536.

3          After Treuting's testimony, the trial judge asked defense counsel for an offer of
4   proof as to why it would be relevant.  RT at 1541–43.  The court ultimately ruled that
5   defense counsel had not provided an adequate offer of proof to permit the testimony.
6   RT at 1582–83.

7          Petitioner later raised the claim on state habeas review, and the state supreme
8   court rejected it on procedural grounds only.  Lodg L.

9          **2.      Additional relevant federal law**

10          The exclusion or admission of evidence under state evidentiary rules generally
11   does not present a federal question.  McGuire, 502 U.S. 62, 67–68 (1991) (state
12   evidentiary ruling does not give rise to a cognizable federal habeas claim unless the
13   ruling violated a petitioner's due process right to a fair trial); Rhoades v. Henry, 638
14   F.3d 1027, 1034 n.5 (9th Cir. 2011).

15          As noted, the Due Process Clause and Sixth Amendment, "guarantee[]criminal
16   defendants 'a meaningful opportunity to present a complete defense.'"  Crane v.
17   Kentucky, 476 U.S. 683, 690 (1986) (quoting Trombetta, 467 U.S. at 485).
18   Nevertheless, "'[a] defendant's right to present relevant evidence is not unlimited, but
19   rather is subject to reasonable restrictions,' such as evidentiary and procedural rules."
20   Moses v. Payne, 555 F.3d 742, 757 (9th Cir. 2008) (quoting United States v. Scheffer,
21   523 U.S. 303, 308 (1998)).  Well-established rules of evidence permit trial judges to
22   exclude evidence if its probative value is outweighed by certain other factors, such as
23   unfair prejudice, irrelevance, confusion of the issues, or potential to mislead the jury.
24   See Holmes v. South Carolina, 547 U.S. 319, 326 (2006) (citations omitted); see also
25   Cudjo v. Ayers, 698 F.3d 752, 766 (9th Cir. 2012).  The Supreme Court has noted
26   "[o]nly rarely have we held that the right to present a complete defense was violated
27   by the exclusion of defense evidence under a state rule of evidence."  Nevada v.
28   Jackson, 569 U.S. 505 (2013) (citations omitted).

1        Moreover, even if a state court's evidentiary decision constitutes error under

2  the federal constitution, habeas relief is not automatic.  Rather, the claim is reviewed

3  under a harmless error standard.  Mays v. Clark, 807 F.3d 968, 979–81 (9th Cir. 2015).

4  As mentioned, an error cannot lead to habeas relief "unless it results in 'actual

5  prejudice'" that had a "substantial and injurious effect or influence in determining the

6  jury's verdict" under Brecht, 507 U.S. at 637.  Mays, 807 F.3d at 980.  Habeas relief is

7  required when "the record is so evenly balanced that a conscientious judge is in grave

8  doubt as to the harmlessness of an error."  Gautt v. Lewis, 489 F.3d 993, 1016 (9th

9  Cir. 2007).

10       **3.**    **Analysis**

11        Here, Petitioner has failed to show he is entitled to federal habeas relief.

12        To the extent Petitioner challenges the exclusion of evidence under state law,

13  such a claim does not implicate the federal Constitution.  See McGuire, 502 U.S. at

14  67–68; Rhoades, 638 F.3d at 1034; Binns v. Allison, 2013 WL 3200503, *10 (C.D. Cal.

15  June 24, 2013) ("[T]o the extent petitioner contends that the trial court erroneously

16  excluded the toxicologist's testimony under California law, petitioner is not entitled to

17  federal habeas relief.").  The Petition itself presents the issue in a single, run-on

18  sentence that fails to provide any argument or citation to relevant authorities.[40]  His

19  glancing reference to "a fair trial" and the Sixth Amendment, is insufficient to convert

20  the claim into a federal issue.  Little, 449 F.3d at 1083 n.6; Johnson, 117 F.3d at 110;

21  Blackledge, 431 U.S. 63, 75 n.7.

22        Even if cognizable, Petitioner has failed to show he is entitled to federal relief

23  for reasons similar to those discussed above.  As noted, the self-defense theories were

24  not promoted by the defense.  Furthermore, there was no evidence, and Petitioner

25  does not allege, he knew Ike was intoxicated.  Without more, Petitioner has not

26

---

27  [40] In this claim, Petitioner cites Exhibit A, pages 23–32, attached to his petition.  Dkt. 1 at 6.  Those

28  pages, however, are his state appellate court opening brief's discussion of state-law cases related to CALCRIM instruction Nos. 3475 and 3476.  Compare Dkt. 1 at 34–37 with Lodg. 3 at 29–32.

1  shown that the toxicologist's testimony would have been relevant to his defense.

2  Accordingly, Petitioner has not shown the trial court's failure to allow the testimony

3  prevented him from presenting a complete defense, nor has Petitioner shown he was

4  prejudiced by the trial court's decision.  Petitioner's claim does not raise a "grave

5  doubt" about the verdict that require habeas relief.  Gautt, 489 F.3d at 1016; Brecht,

6  507 U.S. at 637.

7  ## VII.

8  ## EVIDENTIARY HEARING

9  Petitioner requests an evidentiary hearing, but only as to Claims One and Two.

10  Dkt. 14 at 3.  However, because he has failed to demonstrate the state record received

11  and reviewed by the Court is insufficient to resolve those claims, the request should

12  be denied.  Pinholster, 563 U.S. 170 (federal court's habeas review ordinarily "is

13  limited to the record that was before the state court that adjudicated the claim on the

14  merits"); Schrirro v. Landrigan, 550 U.S. 465, 474 (2007).

15  ## VIII.

16  ## CERTIFICATE OF APPEALABILITY

17  Under 28 U.S.C. § 2253(c)(2), a Certificate of Appealability may issue "only if

18  the applicant has made a substantial showing of the denial of a constitutional right."

19  The Supreme Court has held that this standard means a showing that "reasonable

20  jurists could debate whether (or, for that matter, agree that) the petition should have

21  been resolved in a different manner or that the issues presented were 'adequate to

22  deserve encouragement to proceed further.'"  Slack v. McDaniel, 529 U.S. 473, 483–

23  84 (2000).  The Court finds that Petitioner has met the requisite standard with respect

24  to Claim Three.  Thus, it is recommended that a certificate of appealability be

25  **GRANTED**.

26  ///

27  ///

28  ///

## IX.

## RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that the District Court issue an Order:

    (1) accepting this Report and Recommendation;

    (2) **DENYING** an evidentiary hearing;

    (3) **GRANTING** a Certificate of Appealability; and

    (4) directing that Judgment be entered **DENYING** the Petition and dismissing this action with prejudice.

Dated: October 20, 2021

_____
HONORABLE MARGO A. ROCCONI
United States Magistrate Judge

39